**In the United States District Court
for the District of Kansas**

———————

Case No. 24-cv-02108-TC

———————

AMERICAN FOOD & VENDING CORPORATION,

*Plaintiff*

v.

THE GOODYEAR TIRE & RUBBER COMPANY,

*Defendant*

———————

**MEMORANDUM AND ORDER**

American Food & Vending Corporation sued The Goodyear Tire & Rubber Company for breach of contract. Doc. 1. Goodyear filed a motion to dismiss for lack of personal jurisdiction, Doc. 60, and the parties filed cross motions for summary judgment. Docs. 109 & 110. For the following reasons, Goodyear's motion to dismiss is denied, its motion for summary judgment is granted, and American Food's motion for summary judgment is denied.

**I**

**A**

Each pending motion, one to dismiss for lack of personal jurisdiction and two for summary judgment, has a different standard that governs its resolution. The following describes each applicable standard.

**1.** A defendant may move to dismiss for, among other things, "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). In response, the plaintiff bears the burden to establish that personal jurisdiction exists. *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th Cir. 2020). In "the preliminary stages of litigation [that] burden is light." *XMission, L.C. v. PureHealth Rsch.*, 105 F.4th 1300, 1314 (10th Cir. 2024) (quotation marks omitted). A plaintiff need only make a prima facie showing

of jurisdiction to defeat a motion to dismiss if an evidentiary hearing has not been held. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). The allegations in a complaint are accepted as true if they are plausible, non-conclusory, and not controverted by affidavits. *See Shrader v. Biddinger*, 633 F.3d 1235, 1248 (10th Cir. 2011).

A defendant may, however, challenge the factual basis of the complaint insofar as it relates to personal jurisdiction. Where a defendant has done so, the plaintiff has a duty to come forward with competent proof—such as affidavits or declarations—in support of the jurisdictional allegations of the complaint. *Dental Dynamics LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228 (10th Cir. 2020). This means that a plaintiff may defeat a motion to dismiss by presenting evidence (either uncontested allegations in the complaint or other materials, or an affidavit or declaration) that if true would support jurisdiction over the defendant. *XMission*, 955 F.3d at 839. All factual disputes are then resolved in favor of the plaintiff. *Dudnikov*, 514 F.3d at 1070.

**2.** Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

In a case where the moving party does not bear the burden of persuasion at trial, the summary judgment rules require that party to show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

But in a case where the moving party will bear the burden of proof at trial on a particular issue, the moving party must meet "a more stringent summary judgment standard." *Pelt*, 539 F.3d at 1280; *see also Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015) (discussing a movant with affirmative defenses). That standard requires the movant to "establish, as a matter of law, all essential elements of the issue." *Pelt*, 539 F.3d at 1280. Only then must the nonmovant "bring forward any specific facts alleged to rebut the movant's case." *Id.*

The filing of cross-motions for summary judgment does not alter this standard. Each motion—and its material facts—must "be treated separately," meaning that "the denial of one does not require the grant of another." *Atl. Richfield Co. v. Farm Credit Bank Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

**B**

**1.** This is a contract dispute. Goodyear is a tire manufacturer. *See generally* GOODYEAR, https://www.goodyear.com/en_US/about-us.html (last visited Sept. 22, 2025). It operates manufacturing plants in various locations in the United States, two of which are relevant here: one in Fayetteville, North Carolina and the other in Topeka,

3

Kansas. American Food provides "catering, office coffee, and vending services." Doc. 111-2 at 1.

The two companies began to work together when American Food agreed to provide its services to Goodyear's location in Union Hill, Tennessee. Doc. 109 at ¶ 1.[1] Following that relationship, they contracted for American Food to provide its services to Goodyear locations in Fayetteville and Topeka. *Id.* at ¶¶ 2–3. The parties performed under the Fayetteville and Topeka contracts until Goodyear terminated them. Doc. 114 at ¶¶ 2.a.vi–vii. Those terminations and whether they were permitted by the contracts are at issue in this case.

**2.** As it pertains to this dispute, American Food and Goodyear entered into the two separate contracts in 2010. Doc. 114 at ¶ 2.a.i. The first related to Goodyear's locations in Topeka, Kansas. *See* Doc. 111-2. It granted American Food the right to operate a vending service at Goodyear's Topeka locations. Doc. 114 at ¶ 2.a.ii. The contract had an initial term of five years that would automatically renew for two like terms absent extension or termination from the parties. Doc. 111-2 at § VI. The parties extended that initial term by six years, and the term ended in 2021. Doc. 114 at ¶ 3.a. The initial term then renewed automatically. *Id.*

The second contract related to Goodyear's locations in Fayetteville, North Carolina. *See* Doc. 111-3. It granted American Food the same rights as the Topeka contract: the right to operate vending services at Goodyear's Fayetteville locations. *Id.* It had an initial five-year term that the parties did not extend or renew. Doc. 111-3 at § VI. Thus, the contract automatically renewed for a first five-year term in 2015, Doc. 109 at ¶ 13, and then for a second in 2020. *Id.* at ¶ 14.

The two contracts are largely mirror images of each other but the provisions at the core of this dispute—which concern how much notice is required for a termination to be effective—are identical. The contracts mention termination in two separate provisions. In one, Section III.B of each contract states that Goodyear "agrees to provide American Food a sixty (60) day notice and further sixty (60) days to substantially cure any substantial violation of this Agreement prior to terminating under Section VI. [b]elow." Doc. 114 at ¶ 2.a.iii. In the

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF. All facts are uncontroverted unless otherwise specified.

other, Section VI, it states in pertinent part that "[e]ither party may terminate this Agreement upon forty-five (45) days notice to the other party." *Id.* at ¶ 2.a.v. Another provision of both contracts, Section V, states that the parties "agree to meet and attempt to resolve each and every issue in dispute peaceably and among themselves," set the level of corporate officials that need to be involved, and make clear that any dispute remaining after that attempt is still unresolved will be submitted "to mediation, with a good faith attempt to resolve all claims prior to any litigation." *Id.* at ¶ 2.a.iv. Additionally, the contracts required American Food to pay Goodyear annual commissions for its Topeka sales and monthly for its Fayetteville sales. Doc. 111-2 at 3 (Topeka contract setting annual commission payments); *see also* Doc. 111-3 at 3 (Fayetteville contract setting monthly commission payments).

The parties basically agree that both contracts were in effect until Goodyear purported to terminate them. By way of an email dated May 19, 2021, Goodyear provided American Food written notice of its intent to terminate the Fayetteville, North Carolina contract. Doc. 114 at ¶ 2.a.vi; *see* Doc. 109-5 (invoking Section VI of the agreement and declaring that American Food was required to continue service for forty-five days). That email, which expressly invoked Section VI, did not identify any basis for the termination. Although it appears that American Food responded in a way to suggest it did not believe the termination was proper, Doc. 109 at 7 ¶ 17, the record suggests that American Food ultimately complied with that termination.

Goodyear took similar action with regard to the Topeka contract a few years later. In a letter dated February 23, 2024, Goodyear notified American Food that it intended to terminate the contract concerning the Topeka, Kansas facility. Doc. 114 at ¶ 2.a.vii; *see* Doc. 109-8 (invoking Section VI of the agreement and declaring that the forty-five days following notice would occur on April 11, 2024). Once again, Goodyear's notice invoked Section VI and expressly notified American Food that it was no longer seeking any outstanding commission

payment and, as a result, the dispute resolution provision of Section V did not apply.[2]

**3.** American Food filed a two-count Complaint against Goodyear on both contracts in March 2024. Doc. 1; *see also* Doc. 27. In Count I, American Food argues that Goodyear breached the Topeka contract by terminating it without cause, in violation of Section III.B, and by failing to comply with Section V's issue resolution provision. Doc. 114 at ¶ 4.a.i. Count II makes the same argument for the Fayetteville contract. *Id.* at ¶ 4.a.ii.

The parties have three motions pending. One of them concerns a request by Goodyear to dismiss Count II for lack of personal jurisdiction.[3] Doc. 60. Goodyear argues that there is no general personal jurisdiction over it because it is not at home in Kansas. Doc. 61 at 10. Recognizing that that argument is foreclosed by Kansas's consent-by-registration statute, Goodyear argues that the statute is unconstitutional because it violates the dormant Commerce Clause. *Id.* at 13.

The other two are the parties' cross motions for summary judgment. Docs. 109 & 110. American Food requests summary judgment as to liability on both Counts, arguing that the contracts are unambiguous and Goodyear's termination with fewer than 60 days' notice was a breach.[4] *See generally* Doc. 109. Goodyear requests summary judgment, arguing just the opposite. *See* generally Doc. 111.

## II

Kansas's consent-by-registration statute does not violate the dormant Commerce Clause. But the contracts, which are unambiguous, give either party the authority to terminate them on 45 days'

---

[2] Goodyear moved for summary judgment on both counts, claiming that American Food breached the agreements by failing to pay commissions. Doc. 111 at 17. Goodyear also requests reformation of the contracts on the grounds of mutual mistake. Doc. 125 at 34. Neither contention is considered because of the resolution in Part II.B., *infra*.

[3] Goodyear does not contest personal jurisdiction as it relates to Count I.

[4] American Food makes no argument regarding its previously asserted theory that Goodyear breached the contracts by failing to adhere to Section V's issue-resolution provision. *See generally* Doc. 109.

notice. Accordingly, Goodyear's motion to dismiss is denied, its motion for summary judgment is granted, and American Food's motion for summary judgment is denied.

### A

Goodyear seeks dismissal of Count II by claiming that American Food cannot establish personal jurisdiction over it in the District of Kansas. Doc. 61. That argument runs headlong into Kansas's consent-by-registration statute, which requires foreign corporations that do business in Kansas to register with the secretary of state. Kan. Stat. Ann. § 17-7931. Registration pursuant to Section 17-7931 operates as consent to general personal jurisdiction. *Merriman v. Crompton Corp.*, 146 P.3d 162, 171 (Kan. 2006). Thus, the statute would confirm personal jurisdiction for all claims against Goodyear.

Cognizant of this, Goodyear argues that Kansas's consent-by-registration statute violates the dormant Commerce Clause.[5] Doc. 61 at 13. The Commerce Clause vests Congress with the power to "regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. But the Supreme Court has held that the Clause "also contains a further, negative command, one effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on the subject." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (alterations and quotation marks omitted). This negative command has come to be known as the dormant Commerce Clause.

A law violates the dormant Commerce Clause if it discriminates against interstate commerce. *Nat'l Pork Producers*, 598 U.S. at 369. "[D]iscrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). Laws that are not facially discriminatory may also violate the Clause if they impose an undue burden on

---

[5] Goodyear does not dispute that it filed such a registration document. Indeed, its moving papers anticipate this argument and acknowledge cases in the District of Kansas rejecting arguments similar to the one it is making, but nonetheless argues for a different result because, among other things, it claims they are distinguishable and did not consider its dormant Commerce Clause argument. Doc. 61 at 11 & n.3.

interstate commerce. *Nat'l Pork Producers*, 598 U.S. at 377. That is, "[s]tate laws that regulate even-handedly to effectuate a legitimate local public interest will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018) (alterations omitted); *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Section 17-7931 does not discriminate against interstate commerce.[6] *Contra* Doc. 61 at 14. The statute does not discriminate against out-of-state entities but merely places them in the same footing as in-state entities. *See AK Steel Corp. v. PAC Operating Ltd. P'ship*, No. 15-9260, 2017 WL 3314294, at *5 (D. Kan. Aug. 3, 2017) (finding that Section 17-7931 does not discriminate against interstate commerce); *see also Sloan v. Burist*, No. 22-76, 2023 WL 7309476, at *5 (S.D. Ga. Nov. 6, 2023) (finding that Georgia's consent-by-registration statute does not violate the dormant Commerce Clause). Courts routinely reject dormant Commerce Clause challenges against statutes that regulate evenhandedly and treat both in-state and out-of-state entities similarly. *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 434 (2005) (holding that a local tax did not violate the dormant Commerce Clause because it did not "facially discriminate against interstate or out-of-state activities or enterprises" and it regulated "evenhandedly"); *Flynt v. Bonta*, 131 F.4th 918, 926 (9th Cir. 2025) (holding that two statutes did not violate the dormant Commerce Clause because they applied "evenly to Californians and non-Californians alike").

Cases where the Supreme Court has found that personal jurisdiction over foreign corporations violated the dormant Commerce Clause are instructive. In *Atchison, Topeka & Santa Fe Railway Co. v. Wells*, 265 U.S. 101 (1924), for example, the Supreme Court sustained a dormant Commerce Clause challenge against a Texas statute that granted personal jurisdiction for garnishment suits because the defendant foreign corporation had not been admitted to Texas, had not consented to be

---

[6] Goodyear argues that there is no specific jurisdiction over Count II because it lacks the requisite minimum contacts with Kansas. Doc. 61 at 16. That argument fails because Goodyear consented to general personal jurisdiction in Kansas. As a result, there is no need to explore specific jurisdiction if general jurisdiction is proper. *See, e.g.*, *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017) (noting that general personal jurisdiction permits a court to hear "any and all claims" against a defendant").

sued in Texas, did not own any property in Texas, and had no agent in Texas. *See also Michigan Cent. R. Co. v. Mix*, 278 U.S. 492, 493 (1929) (finding that personal jurisdiction burdened interstate commerce where the defendant "has not consented to be [in the forum state], has never been admitted to do business there, and has never done any business there"). None of those dispositive facts are present in this case. To the contrary, Goodyear has registered to do business in Kansas, owns property in Kansas, consented to be sued in Kansas courts, and appointed a registered agent to receive process.

Goodyear chafes at the consent by registration argument, claiming that the statute discriminates between Kansas and foreign corporations. In support, it invokes *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), and *Granholm v. Heald*, 544 U.S. 460 (2005), to argue that Section 17-7931 discriminates against interstate commerce by forcing foreign companies to consent to general personal jurisdiction in Kansas while "Kansas companies do not face similar burdens for expanding operations into other states that do not have consent-by-registration statutes." Doc. 74 at 6; *see* Doc. 61 at 15.

An examination of this argument and the authorities on which it is based undermines it. In *Hunt*, for example, a North Carolina statute required all apple containers shipped into the State to be labeled with a U.S. grade. *Hunt*, 432 U.S. at 335. The State of Washington filed suit arguing that the statute discriminated against interstate commerce. *Id.* Washington had invested substantial sums into its apple-growing operations, developing a robust system of inspection and cultivating the reputation of the superior quality of its apples. *Id.* at 336–37. In derogation of this effort, the North Carolina statute forced Washington apple growers to remove their Washington grade label from their apples, thereby depriving the product of a mark that set it apart from others in the market. *Id.* at 348–49. The Supreme Court held that the North Carolina statute discriminated against interstate commerce in three ways. First, the statute raised the cost of production for Washington apple growers by forcing them to remove their label and use a U.S. label. *Id.* at 351. North Carolina growers' costs were not increased because they were free to continue labeling their apples as they were before the statute's enactment. *Hunt*, 432 U.S. at 351. Second, the statute stripped Washington apple growers' competitive advantage in the market: Washington grade labels had gained nationwide recognition, and consumers preferred Washington-labeled apples because of their superior quality; North Carolina apples enjoyed no such recognition or

preference. *Id.* And third, the statute protected North Carolina apple growers by ensuring that their apples did not have to compete against a better product, for if all apples bore a U.S. grade label then consumers could not distinguish the superior Washington apples from others. *Id.*

*Granholm v. Heald*, 544 U.S. 460 (2005), had similar facts. In that case, the Court struck down two Michigan and New York statutes that allowed in-state wineries to sell directly to consumers but prohibited out-of-state wineries from doing the same. *Granholm*, 544 U.S. at 473–74. The Court found that the discriminatory character of the two statutes was obvious. *Id.* By forcing out-of-state wineries to sell through in-state wholesalers, the statutes increased the production costs of out-of-state wineries. *Id.*

Section 17-7931 evinces none of the discriminatory intent nor poses any of the problems of the statutes in either *Hunt* or *Granholm*. *Contra* Doc. 61 at 15. To begin with, the statutes in those cases targeted classic economic conduct, while Section 17-7931 deals with registration to do business and personal jurisdiction. Section 17-7931 does not raise the costs of out-of-state entities as it relates to in-state entities because both are subject to general personal jurisdiction in Kansas. Goodyear's argument that businesses face a "Hobbesian choice: consent to general jurisdiction to operate in the state or refuse to consent to jurisdiction and be excluded from operating in the state" misses the point. *See* Doc. 61 at 14. That choice applies to any business wishing to do business in Kansas regardless of whether it is foreign or domestic. *See generally Factory Mut'l Ins. Co. v. Flender Corp.*, No. 24-1081, 2025 WL 1810064, at *4–6 (D. Kan. June 30, 2025) (applying the Supreme Court's decision in *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023), in support of the conclusion that Kansas's consent-by-registration statute was constitutional).

Goodyear further argues that Section 17-7931 violates the dormant Commerce Clause because its effect places an undue burden on interstate commerce. Doc. 61 at 15. That argument implicates the so-called *Pike* balancing test. In *Pike*, the Supreme Court held that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. In other words, *Pike* is frequently implicated where the statute was not facially discriminatory, but the practical effects of the statute

disclose a discriminatory purpose. *See generally Nat'l Pork Producers*, 398 U.S. at 377.

Goodyear's burden under *Pike* is high. "To put things in perspective, the Supreme Court has not invalidated a law under *Pike* in more than 30 years." *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023); *accord Nat'l Pork Producers*, 598 U.S. at 380 (recognizing that only a small number of cases have been invalidated under that theory). *Pike* does not give judges the power to strike down duly enacted laws based on their assessment of the laws' costs and benefits. *Nat'l Pork Producers*, 598 U.S. at 380. This is because judges are "not institutionally suited" to make those calls. *Id.*; *see also Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring) (noting that *Pike* is "like judging whether a particular line is longer than a particular rock is heavy").

As in *National Pork*, Goodyear's *Pike* challenge fails. Goodyear asserts that Section 17-7931 "constitutes a de facto substantial burden on interstate commerce," Doc. 61 at 16, but it provides no evidence in support of that assertion. This is enough to reject Goodyear's argument under *Pike. See Am. Trucking Ass'ns*, 545 U.S. at 429–37 (denying a *Pike* challenge where the record showed no evidence of an undue burden, and rejecting the petitioners' argument that "they do not need empirically to demonstrate the existence of a burdensome or discriminatory impact"); *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 116 (2d Cir. 2025) ("Here, in the absence of any evidence or specific findings regarding the economic benefits and burdens of [the challenged statute], we find no undue burden under *Pike*."). Having provided no evidence of Section 17-7931's alleged costs and benefits, or of how the costs so outweigh the benefits such that the statute poses an undue burden on interstate commerce, Goodyear thus asks for an abstract determination based on a court's own assessment of the costs and benefits, which a federal court "can hardly do." *Nat'l Pork Producers*, 598 U.S. at 380; *see CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987) ("We are not inclined to second-guess the empirical judgments of lawmakers concerning the utility of legislation.").

## B

American Food asserts Goodyear breached the two contracts by improperly terminating them without proper notice and an opportunity to cure. In Kansas, a breach of contract claim requires the existence of a contract between the parties, adequate consideration to

11

support the contract, the plaintiff's performance or willingness to perform the contract, the defendant's breach of the contract, and damages to the plaintiff as a result of the breach.[7] *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013). The elements are similar in North Carolina. *Hoaglin v. Duke Univ. Health Sys., Inc.*, 901 S.E.2d 378, 384 (N.C. Ct. App. 2024).

Both sides request summary judgment on this issue. Docs. 109 at 11 & 111 at 19. American Food argues that the contracts' unambiguous language did not permit Goodyear's termination, and Goodyear argues that it did. Doc. 109 at 11; Doc. 111 at 19. Resolving those motions requires construction of the parties' agreement.

Under Kansas law, courts must interpret contracts "as the contracting parties intended." *Harding v. Capitol Fed. Sav. Bank*, 556 P.3d 910, 919 (Kan. Ct. App. 2024). When a contract is unambiguous, the court must "interpret the contract provision as clearly and unambiguously written." *Id.* And provisions must be interpreted in a way "that is consistent with the entire contract." *Id.* at 920. This means that courts "should not interpret one provision within a contract in a way that renders other provisions or language within the contract meaningless." *Id.*

Whether Goodyear's termination of the contracts was proper turns on two relevant provisions. Section III.B of the contracts states: "[Goodyear] agrees to provide American Food a sixty (60) day notice and further sixty (60) days to substantially cure any substantial violation of this Agreement prior to terminating under Section VI. [b]elow." Doc. 112-2 at 3; Doc. 114 at ¶ 2.a.iii. Section VI then states: "Either party may terminate this Agreement upon forty-five (45) days notice to the other party." Doc. 112-2 at 4; Doc. 114 at ¶ 2.a.v.

The parties interpret the two terminations provisions differently. American Food reads the sections as establishing an initial requirement of 120 days' notice—a sixty day period of notice followed by a subsequent sixty day period of cure—prior to any termination. Doc. 109 at 11. It rejects that Goodyear could terminate the contracts on 45 days'

---

[7] The parties agree that Kansas law governs the Topeka contract and North Carolina law governs the Fayetteville contract. Doc. 114 at ¶ 1.d. But in any event, they further agree that there are no material differences between those States' governing law regarding the issues in this case. *Id.*

notice under Section VI without cause, essentially suggesting that Section VI should be ignored. *Id.* Goodyear reads both provisions as having vitality. According to Goodyear, Section III.B applies in the event of a substantial violation where the allegedly breaching party is to be given both notice and an opportunity to cure; Section VI is a termination-for-convenience provision that is effective forty-five days after notice is given for any reason other than a substantial violation. Doc. 111 at 20–21.

Applying the plain and unambiguous language of the parties' agreements compels judgment in favor of Goodyear. *Contra* Doc. 109 at 15. Section VI is unambiguous that either party had the power to terminate the contracts on 45 days' notice, and it placed no limits on that power. Doc. 114 at ¶ 2.a.v; *see St. Catherine Hosp. of Garden City v. Rodriguez*, 971 P.2d 754, 756 (Kan. Ct. App. 1998) (finding no breach where the contract permitted either party to terminate "at any time, without cause"); *Augusta Med. Complex, Inc. v. Blue Cross of Kan., Inc.*, 608 P.2d 890, 894 (Kan. 1980) (same). Section III.B is similarly unambiguous: It requires 60 days' notice and 60 days to cure, prior to termination under Section VI, for any substantial violation. Doc. 114 at ¶ 2.a.iii. In other words, a party may either terminate under Section VI for any reason upon specified notice or for a substantial violation upon specified notice and an opportunity to cure. Goodyear chose the former option.

American Food disagrees. It argues that Goodyear's interpretation renders Section III.B meaningless because Goodyear would never terminate the contracts under Section III.B for a substantial violation when it could just terminate them pursuant to Section VI and do an "end run" around Section III.B. Doc. 109 at 14; Doc. 123 at 25. That argument fails for at least two reasons. For one thing, courts cannot ignore a provision of a contract that one party now regrets. Even if American Food now finds Section VI insufficiently protective of its continuing business operation, that is a concern the parties negotiated and reduced to writing. Courts may not rewrite the agreement. *Krigel & Krigel, P.C. v. Shank & Heinemann, LLC*, 528 P.3d 1030, 1039 (Kan. Ct. App. 2023); *Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 535 (10th Cir. 2016).

For another, both provisions can and did operate in harmony. Section III.B prevented Goodyear from terminating the contract(s) for a substantial violation on 45 days' notice pursuant to Section VI. Section III.B. specifies that Goodyear, believing a substantial violation of the contract has occurred, must give notice and an opportunity to cure

over 120 days. That is because Section III.B. notes that, "prior to terminating under Section VI," Goodyear had to provide American Food 60 days' notice and 60 days "to substantially cure any substantial violation" of the agreements. Doc. 114 at ¶ 2.a.iii. If Goodyear attempted to terminate the agreements with 45 days' notice because of a substantial violation on American Food's part, that would be a breach—Goodyear would first have to give American Food 60 days' notice and 60 days to cure the substantial violation. *Id.* But Section III.B. does not apply to any and all terminations of the agreements. To conclude otherwise would excise the phrase "to substantially cure any substantial violation" from the text.

American Food's argument is atextual. It claims that "Goodyear can only terminate the Contracts for a substantial violation, and only after American Food has been given an opportunity to cure." Doc. 109 at 11. That may be what American Food wishes the contracts to say, but it is inconsistent with the words used in Section III.B. Section VI—which American Food ignores—provides another mechanism for either party to terminate the contract. Section III.B.'s mention of a substantial violation does not mean that Goodyear can only terminate for a substantial violation. *Contra* Doc. 109 at 11. Rather, it means that Section III.B.'s notice-and-cure provision only applies in the event of a substantial violation. Section VI's language cannot be ignored, and the provisions must be read in harmony where, as here, such a construction is plain. *Osterhaus v. Toth*, 249 P.3d 888, 902 (Kan. 2011); *accord* Doc. 123 at 24 (acknowledging Kansas and North Carolina law require contracts to be read as a whole and that courts may not interpret a contract to render any term meaningless).

### III

For the foregoing reasons, Goodyear's Motion to Dismiss, Doc. 60, is DENIED, its Motion for Summary Judgment, Doc. 110, is GRANTED, and American Food's Motion for Summary Judgment, Doc. 109, is DENIED.

It is so ordered.

Date: September 29, 2025                    s/ Toby Crouse
                                            Toby Crouse
                                            United States District Judge

14